# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROBERT ANTHONY MCGEHEE,**

    **Plaintiff,**

    **vs.**                              **Civ. No. 18-1164 KK**

**ANDREW SAUL, Commissioner**
**of the Social Security Administration,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 12) filed February 25, 2019 in support of Plaintiff Robert McGehee's ("Mr. McGehee") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying Mr. McGehee's claims for Title II child disability benefits and Title XVI supplemental security income benefits. On May 9, 2019, Mr. McGehee filed his Motion to Reverse or Remand Administrative Agency Decision and Memorandum Brief in Support. (Doc. 18.) The Commissioner filed a Brief in Response on July 22, 2019 (Doc. 22), and Mr. McGehee filed a Reply on September 16, 2019. (Doc. 26.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and being fully advised in the premises, the Court FINDS that the Motion to Reverse or Remand is well taken and should be **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

# I. **Background**

Mr. McGehee was born on January 4, 1990 and lives with his parents in Albuquerque, New Mexico. (Administrative Record ("AR") 050-51, 079.) He grew up in Tucson, Arizona and began receiving special education services in elementary school due to a specific learning disability and a speech/language impairment. (AR 407, 433.) Mr. McGehee, who testified at his administrative hearing that he completed either his junior or senior year in high school, never obtained his GED and has never had a driver's license because, according to his mother, he was unable to pass the test "because of his reading level." (AR 051, 061, 328.)

When he was sixteen years old, Mr. McGehee suffered an alcohol overdose—including a possible anoxic brain injury[2]—during which he lost consciousness and had to be resuscitated by paramedics. (AR 432, 440.) He was in a coma for one day following the overdose. (AR 432.) His mother reported that following that incident, he became "very argumentative and very moody[,]" has had problems with memory, judgment, and insight, can only perform one-step instructions, and is impulsive and impatient. (AR 432.) For two years around age twenty, he was living on the streets in Tucson and doing "a lot of methamphetamine as a way of self-medicating." (AR 433.) During that time, he was "shot at, stabbed, and jumped," experiences to which he attributes his development of post-traumatic stress disorder ("PTSD"). (AR 057.) In addition to PTSD, he has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), mood disorder not otherwise specified ("nos"), impulse control disorder nos, personality disorder nos with borderline and antisocial traits, polysubstance dependence, unspecified episodic mood disorder (later changed to bipolar I disorder), and unspecified psychosis (later changed to unspecified schizophrenia

---

[2] "Anoxic brain injury happens when your brain doesn't get any oxygen." WebMD, https://www.webmd.com/brain/qa/what-is-anoxic-brain-injury (last visited October 5, 2019).

spectrum and other psychotic disorder).[3] (AR 023, 440, 485, 681, 696, 952.) Consulting examiner Barbara Koltuska-Haskin, Ph.D., who completed a neuropsychological evaluation of Mr. McGehee in May-September 2014, additionally identified "[h]istory of anoxic brain trauma" as a general medical condition potentially bearing upon Mr. McGehee's diagnosed mental disorders. (AR 440.) Since April 2014, Mr. McGehee has been under the care of psychiatrist Edwin Hall, M.D., who has treated Mr. McGehee's mental conditions with prescription medications as well as monthly counseling.[4] (AR 446-87, 639-709, 832-974.)

Mr. McGehee's work history consists of a number of jobs in the fast-food industry, each of which he has held for less than one year and some of which he has held for as little as two months. (AR 051-54, 293-96, 433.) He was fired from one job for taking too many cigarette breaks. (AR 433.) He was either fired from or quit each of the other jobs. (AR 054-55, 070, 433.) In 2014, he was fired from his most recent job at Little Caesar's for yelling at a coworker for telling him what to do. (AR 053, 294-95.)

## II. Procedural History and the ALJ's Decision

Mr. McGehee protectively filed applications for disability insurance benefits, child disability insurance benefits (based on an onset date before age twenty-two), and supplemental security income on September 5, 2014. (AR 079-81, 082, 096.) He alleged a disability-onset date of January 1, 2010, three days before his twentieth birthday. His claims were initially denied on January 30, 2015 and again upon reconsideration on September 2, 2015. (AR 082-123, 124-65.) Mr. McGehee requested a hearing before an administrative law judge ("ALJ") (AR 197-201), and

---

[3] Mr. McGehee's physical impairments alleged to cause disability are not at issue in this appeal and will not be discussed by the Court.

[4] The record indicates that Mr. McGehee was often seen by a John Connell, qualifications and credentials unspecified, who appears to be a colleague or associate of Dr. Hall. (*See* AR 062; *compare* AR 483-87, *with* 479-82.) Because all medical records for which "John Connell" is identified as the provider of record are cosigned by Dr. Hall, the Court refers to the records as being those of Dr. Hall for ease of reading and simplicity.

ALJ Cole Gerstner held an administrative hearing on June 2, 2017. (AR 046-78.) Mr. McGehee and an impartial vocational expert ("VE"), Nicole King, testified. (AR 050-72, 072-77.)

In his decision, the ALJ found that prior to attaining the age of twenty-two and since the alleged onset date, Mr. McGehee has suffered from the following severe mental impairments: PTSD, ADHD, bipolar affective disorder, organic mental disorder, conduct disorder, personality disorder, and impulse control disorder. (AR 023.) Because the ALJ found that none of those impairments, alone or in combination, were presumptively disabling under any of the Listings (AR 023-25), *see* 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, he proceeded to assess Mr. McGehee's residual functional capacity ("RFC"). (AR 025-35.) In relevant part, the ALJ found that Mr. McGehee "is limited to work involving performance of simple, routine and repetitive tasks and to simple work-related decisions. He can have only incidental contact with supervisors, coworkers and the public. In addition to normal work breaks, he will be off task 5% percent [sic] of [the] time in an 8-hour workday." (AR 025-26.)

The ALJ found that Mr. McGehee has no past relevant work (AR 035-36) but that given his age, education, work experience, and RFC, he would be able to perform other jobs that exist in significant numbers in the national economy. (AR 036-37.) The ALJ therefore found that Mr. McGehee was "not disabled." (AR 037.) Mr. McGehee sought review by the Appeals Council, which denied his request. (AR 001-4, 254.) Mr. McGehee then appealed to this Court. (Doc. 1.)

### III. Applicable Law

#### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d

1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (internal quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

**B.      Disability Benefits and the Sequential Evaluation Process**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy[.]" 42

U.S.C. § 423(d)(2)(A). "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[5] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv). If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1)-(3), 416.945(a)(1)-(3). This is called the claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(a)(1) & (a)(3), 416.945(a)(1) & (a)(3). The claimant's RFC is used at step four of the process to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e), 416.920(a)(4)(iv), 416.920(e). If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner at step five to show

---

[5] 20 C.F.R. pt. 404, subpt. P. app. 1.

that the claimant is able to perform other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Grogan*, 399 F.3d at 1261.

## C.    Consideration of Evidence and Weighing of Medical Opinions

The ALJ must consider "all relevant evidence in the case record" in making a disability determination. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006).[6] Under the regulations, the Social Security Administration ("SSA") considers "evidence" to include "anything that [the claimant] or anyone else submits to us or that we obtain that relates to the [claimant's] claim." 20 C.F.R. §§ 404.1513(a), 416.913(a). The five categories of evidence comprise (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). Although an ALJ is not required to discuss every piece of evidence in the record, the ALJ's decision "must demonstrate that the ALJ considered all of the evidence[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

Regarding medical opinion evidence, the ALJ is required to discuss the weight assigned to each medical opinion of record. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii)). Generally, the ALJ should accord more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has rendered an opinion based on a review of medical records alone. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("The opinion of an examining physician is generally entitled to less weight than that of a treating

---

[6] The Court acknowledges that Social Security Ruling 06-03P has been rescinded effective for claims filed on or after March 27, 2017. *See* SSR 96-2P, 2017 WL 3928298, at *1 (Mar. 27, 2017). However, Mr. McGehee's claims were filed in 2014, making that ruling and case law interpreting it still applicable.

physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."). Indeed, a treating source's opinions are entitled to controlling weight if they are well-supported and consistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). As such, when the record contains opinions from a treating source, the weighing of medical opinions proceeds through a sequential process: the ALJ must first determine whether the treating source's opinions deserve controlling weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (describing the analysis as "sequential" and explaining that "[i]n deciding how much weight to give a treating source, an ALJ must first determine whether the opinion qualifies for 'controlling weight'"). Even if not entitled to controlling weight, a treating source's medical opinions are "still entitled to deference and must be weighed using all of the relevant factors." *Langley*, 373 F.3d at 1120 (alteration and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c), 416.927(c) (setting forth the factors to be weighed, comprising (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors). If the ALJ rejects the opinions of treating and examining sources in favor of a non-examining source's opinion, he must provide specific, legitimate reasons for doing so. *See Watkins*, 350 F.3d at 1301. The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Robinson*, 366 F.3d at 1082 (internal quotation marks omitted). An ALJ's failure to set forth adequate reasons explaining why a medical opinion was rejected or assigned a particular weight and demonstrate that he has applied the correct legal standards in evaluating the evidence constitutes reversible error. *See Reyes v. Bowen*, 842 F.2d 242, 244 (10th Cir. 1988) (explaining that an ALJ's failure to follow the "specific rules of law that must be followed in weighing particular types of evidence in disability cases . . .

constitutes reversible error"). Additionally, if an RFC assessment "conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, at * 7 (Jul. 2, 1996).

## IV. <u>Discussion</u>

Mr. McGehee argues that the ALJ erred by (1) picking and choosing among the moderate limitations in the opinion of State agency psychiatric consultant Scott Walker, M.D., (2) improperly weighing the opinions of Dr. Hall and Dr. Koltuska-Haskin, and (3) breaching his duty to develop the record with respect to Mr. McGehee's anoxic brain injury. (Doc. 18 at 1-2.) The Court addresses each of Mr. McGehee's contentions, though not in the order presented. In keeping with the sequential process for evaluating medical opinions, the Court first addresses the ALJ's handling of treating-source Dr. Hall's and evaluating-source Dr. Koltuska-Haskin's respective opinions. Although the Court concludes that the ALJ committed reversible error by failing to demonstrate that he applied the correct legal standards in evaluating their opinions, the Court proceeds to address the ALJ's handling of Dr. Walker's opinion, finding error there as well that must be corrected on remand. Because the Court concludes that remand for further proceedings is necessary, the Court also briefly addresses the ALJ's failure to develop the record with respect to Mr. McGehee's alleged anoxic brain injury, an issue that should also be addressed on remand.

**A.  The ALJ's reasons for discounting the opinions of Dr. Hall and Dr. Koltuska-Haskin are legally inadequate.**

**1.  Dr. Hall**

Mr. McGehee began treating with Dr. Hall in April 2014 and was seen at Dr. Hall's office on a monthly basis for medication management and psychotherapy through at least March 2017. (AR 446-87, 639-709, 832-974.) Dr. Hall completed two Mental Assessment of Ability to do Work-Related Activities forms ("medical source statements")—one in June 2015, and one in April

2017—in which he opined that Mr. McGehee has "marked" limitations in thirteen of the twenty areas of mental functioning assessed and "moderate" limitations in the other seven. (AR 713-716, 976-79.) While recognizing Dr. Hall as "an acceptable medical source . . . who had a treating relationship with [Mr. McGehee]," the ALJ gave two reasons for according "little weight" to, i.e., rejecting,[7] Dr. Hall's opinions: (1) "his opinions regarding [Mr. McGehee's] limitations are inconsistent with his own treating records, which indicate that he thought [Mr. McGehee's] symptoms were stable and that he was 'doing well'"; and (2) Dr. Hall's opinions are "inconsistent with his opinion that [Mr. McGehee] has a stable [Global Assessment of Functioning ("GAF")] rating and his encouraging [Mr. McGehee] to return to school, work with a vocational rehabilitation organization, his own mental status evaluations, and join a gym." (AR 035.) After providing these two reasons, the ALJ's decision contains no further discussion of Dr. Hall's opinions or explanation of why the ALJ rejected them. The Court considers each of the ALJ's proffered reason in turn, concluding neither provides an adequate basis for the ALJ's rejection of Dr. Hall's opinions.

As support for the first reason for effectively rejecting Dr. Hall's opinions, the ALJ cited Exhibits 12F and 15F (AR 035), which contain Dr. Hall's June 2015 and April 2017 medical source statements respectively. (AR 713-716, 976-79.) Neither of the records the ALJ cited indicates that Dr. Hall thought Mr. McGehee's "symptoms were stable" or that he was "doing well." Rather, they document Dr. Hall's opinions regarding Mr. McGehee's mental limitations. The Court's review of the record reveals that it is Dr. Hall's treatment records, not the cited medical source statements, that contain evidence regarding Mr. McGehee's response to treatment. It is true that many of Dr. Hall's treatment records contain notes indicating that Dr. Hall believed Mr. McGehee

<hr>

[7] *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (describing the ALJ's "'according little weight to'" an opinion as "effectively rejecting" it).

was "doing well" and that Mr. McGehee's symptoms had stabilized with medication. For example, as early as May 2014, i.e., one month after Mr. McGehee first started seeing Dr. Hall, Dr. Hall's treatment record notes that "[i]n testing with Dr. Koltushka [sic]," Mr. McGehee was "[d]oing well except for the inability of the patient to follow through with testing due to focus." (AR 481.) The very next month in June 2014, Mr. McGehee was described as having improved focus, concentration, and organizational skills as a result of taking Adderall for his ADHD. (AR 477.) In April 2015, Mr. McGehee's "[r]age and aggression" were described as "much better," and he was reportedly "[d]oing well" with his medications. (AR 661.) A September 2016 record indicates that Mr. McGehee "is doing well" and that his sleep was "improved," his work ethic was "positive," he felt "more attentive," and that "[o]ptions for [n]ext steps"—i.e., school or vocational rehab— were discussed with him. (AR 880.) In December 2016, it was noted that Mr. McGehee "seems to be doing fairly well at this time." (AR 833.) In January 2017, Dr. Hall noted, "[d]oing well with moods and mood swings" and "[d]oing well overall." (AR 849.) And in March 2017, Dr. Hall noted, "He is doing well at this time with his ADHD medications" and "[c]ontinues to do well with workouts and exercise program." (AR 833.) In other words, the record generally supports the ALJ's characterization of Dr. Hall's treatment records as indicating that Dr. Hall "thought [Mr. McGehee's] symptoms were stable and that he was 'doing well.'" (AR 035.)

However, what it does not support is the ALJ's conclusory finding that Dr. Hall's opinions regarding Mr. McGehee's mental functioning limitations are "inconsistent" with his treatment records. Critically, the ALJ's decision includes no discussion of Dr. Hall's specific opinions, which changed over time and generally tracked Mr. McGehee's response to treatment, and which were consistent with Dr. Hall's treatment records. Specifically, while the number of marked versus moderate limitations remained the same in Dr. Hall's 2015 and 2017 medical source statements,

Dr. Hall's opinions changed regarding the severity of Mr. McGehee's limitations in certain areas of functioning. In the areas of (1) working in coordination with or proximity to others without being distracted by them, (2) interacting appropriately with the general public, and (3) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, Dr. Hall opined that Mr. McGehee's limitations were less restrictive, i.e., were "moderate" in 2017 as compared to "marked" in 2015. (AR 713-14, 976-77.) These opinions are consistent with Dr. Hall's treatment records, which indicate that Mr. McGehee responded well to Adderall, that his ADHD symptoms—including distractibility—had improved over time, and that he was "much more amenable and able to interact with others and tolerate different views." (AR 853, 866.) In the areas of (1) making simple work-related decisions, (2) asking simple questions or requesting assistance, and (3) maintaining socially appropriate behavior adhering to basic standards of neatness and cleanliness, however, Dr. Hall opined that Mr. McGehee's limitations were more restrictive, i.e., were "moderate" in 2015 but "marked" in 2017. (AR 713-14, 976-77.) The ALJ pointed to nothing specific in the record that is necessarily inconsistent with these particular opinions, or with any of Dr. Hall's opinions, regarding Mr. McGehee's limitations in his ability to perform certain work-related activities. Dr. Hall's belief that Mr. McGehee was "doing well" and that his symptoms had improved as his conditions stabilized with ongoing treatment and medication, is not a specific, legitimate reason for the ALJ to categorically reject his opinions concerning Mr. McGehee's work-related mental limitations.

The ALJ's other reason for effectively rejecting Dr. Hall's opinions is equally inadequate. The fact that Dr. Hall discussed with Mr. McGehee the possibility of returning to school, receiving vocational rehabilitation, or joining a gym is not a proper justification for rejecting Dr. Hall's opinions wholesale. Initially, the Court notes that the ALJ cited no evidence whatsoever to support

this proffered reason. (AR 035.) The Court's review of the record indicates that Dr. Hall's treatment records contain a single reference to a discussion regarding the possibility of pursuing "[s]chool or vocational rehab" as a "next step" for Mr. McGehee. (AR 880.) That discussion occurred in September 2016, and no evidence of record after that time contains any further mention of either schooling or vocational rehabilitation. Indeed, at his administrative hearing, Mr. McGehee testified that he had never been to vocational rehabilitation. (AR 061.) Regarding joining a gym, the record evinces that Mr. McGehee, who is considered morbidly obese and has high blood pressure, discussed exercising and nutrition with Dr. Hall on numerous occasions due to his frustrations over being unable to lose weight and, in fact, started exercising with a personal trainer and began to lose weight. (*See, e.g.*, AR 833, 840, 856, 869.) However, despite that the Court has been able to locate the foregoing evidence in the record, it does not support the ALJ's finding that Dr. Hall's opinions regarding Mr. McGehee's work-related mental limitations are inconsistent with the evidence of record.

The ALJ's reliance on Dr. Hall's "own mental status evaluations" as a basis for rejecting Dr. Hall's opinions suffers from the same deficiencies. Specifically, the ALJ cited no evidence and provided no explanation to support this vague and conclusory reason for finding that Dr. Hall's opinions are inconsistent with the evidence of record. Notably, mental status examinations (MSE) document a clinician's observations of the patient at a particular point in time and cover a variety of categories, including appearance, emotions, thoughts, cognition, judgment, and insight. (*Compare* AR 835, *with* AR 887.) The ALJ provided no explanation connecting Dr. Hall's various observations in the MSEs he performed at each of Mr. McGehee's visits (which documented similar, but not identical, observations) to his opinions regarding Mr. McGehee's work-related mental functioning limitations. To the extent there may be legitimate reasons for discounting Dr.

Hall's opinions because they are inconsistent with his MSEs, the ALJ failed to articulate with sufficient specificity those reasons.

Similarly and finally, the ALJ provided no explanation of how Dr. Hall's recording of GAF scores of 69 is inconsistent with finding moderate and marked limitations in specific work-related mental functioning abilities. It is true that a GAF score of 69 indicates the presence of "mild" as opposed to "moderate" or "serious" symptoms. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005) (providing that a GAF score between sixty-one and seventy is assessed when the patient is believed to have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but [is] generally functioning pretty well, [with] some meaningful interpersonal relationships"). However, the GAF assesses an overall level of functioning that encompasses psychological, social, *and* occupational functioning, not just occupational functioning. *See Keyes-Zachary*, 695 F.3d at 1162 n.1 (10th Cir. 2012) ("The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning."); *Langley*, 373 F.3d at 1122 n.3 ("The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's *overall level of functioning.*'" (emphasis added) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 32 (4th ed., text rev. 2005)). The Court fails to see—and the ALJ failed to explain—how Dr. Hall's assessment of GAF scores of 69, reflective of Dr. Hall's opinion regarding Mr. McGehee's *overall* level of functioning at particular points in time, supports the ALJ's rejection of Dr. Hall's specific opinions regarding Mr. McGehee's moderate and marked limitations in particular areas of occupational functioning. On the whole,

then, the ALJ's second basis for discounting Dr. Hall's opinions—premised on conclusory rather than specific, legitimate reasons—is also inadequate to justify the ALJ's rejection of Dr. Hall's opinions.

In sum, the ALJ's decision—which includes neither a threshold controlling-weight analysis nor evinces that the ALJ weighed Dr. Hall's opinions under the applicable regulatory factors—fails to demonstrate compliance with the standards for evaluating the medical opinions of a treating source. For that reason, the Court concludes that the ALJ committed reversible error in weighing Dr. Hall's opinions.

## 2. Dr. Koltuska-Haskin

The ALJ accorded only "some weight" to the opinions of examining source Dr. Koltuska-Haskin, discounting her opinions for three stated reasons: because (1) her opinion "is based in at least [part] on [Mr. McGehee's] allegation that he had an anoxic brain injury due to alcohol, a condition which there is no evidence of in the evidence of record"; (2) "her assignment of a GAF rating of 35 to [Mr. McGehee] is inconsistent with the GAF rating of 69 [Dr. Hall] opined [Mr. McGehee] had"; and (3) she did not offer "an opinion as to [Mr. McGehee's] abilities function by function[.]" (AR 035.) The Court considers each of these proffered reasons in turn.

Starting with Dr. Koltuska-Haskin's consideration of a possible anoxic brain injury in evaluating Mr. McGehee's cognitive and emotional functioning, the ALJ erred in discounting her opinions based on his finding that there was "no evidence" of that condition in the record. Dr. Koltuska-Haskin, an acceptable medical source who evaluated Mr. McGehee on four occasions, offered her professional opinion that Mr. McGehee had experienced anoxia at least once—and possibly twice—in his life: the first time at birth due to the umbilical cord being wrapped around his neck during delivery by a Cesarean section, which Dr. Koltuska-Haskin opined "probably"

resulted in anoxia, and the second time at age sixteen when he suffered an alcohol overdose that caused him to lose consciousness, required resuscitation by paramedics, and resulted in Mr. McGehee being in a coma for one day. (AR 432, 440.) Her Axis III diagnosis of "[h]istory of anoxic brain trauma" was based on not only reporting by Mr. McGehee and his mother of historical events but also objective medical evidence, to wit the results of the psychological tests she administered. (AR440.) *See* 20 C.F.R. §§ 404.1502(c),(f), 416.902(c),(f) (defining "[o]bjective medical evidence" as meaning "signs, laboratory findings, or both" and defining "[l]aboratory findings" as including "psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,] . . . includ[ing] . . . psychological tests"). In addition to documenting that Mr. McGehee's mother reported that Mr. McGehee "became 'very argumentative and very moody'" and had memory problems and could only perform one-step instructions following his alcohol overdose (AR 432), Dr. Koltuska-Haskin independently found, based on administration of standardized tests, Mr. McGehee to have "below average ability to perform mental operations on immediate memory." (AR 437.) All of the foregoing is "evidence" of the presence of an anoxic brain injury,[8] *see* 20 C.F.R. §§ 404.1513(a)(1),(3), 416.913(a)(1),(3), and renders the ALJ's finding that there was "no evidence" of anoxia patently unsupported. His discounting of Dr. Koltuska-Haskin's opinions based on that unsupported finding was error.

The ALJ's second reason for discounting Dr. Koltuska-Haskins' opinions is also inadequate. Dr. Koltuska-Haskin assessed Mr. McGehee as having a GAF score of 35-40—indicating her opinion that Mr. McGehee had "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical*

---

[8] Mood and personality changes and memory loss are considered signs and symptoms of anoxia. *See* Healthline, https://www.healthline.com/health/anoxia (last visited October 5, 2019).

*Manual of Mental Disorders DSM-IV-TR* 34 (4th ed., text rev. 2005)—as of May-September 2014 when she conducted her evaluation. (AR 432, 440-41.) The first time Dr. Hall documented a GAF score for Mr. McGehee was January 31, 2015. (AR 696.) There is nothing inherently inconsistent about different GAF scores being assessed at different points in time, particularly given that Mr. McGehee was just starting medications to manage his conditions when Dr. Koltuska-Haskin evaluated him in 2014, and his medication regimen had been titrated for many months with many of his symptoms having improved by the time Dr. Hall assessed a GAF score of 69 in 2015. (AR 448, 455, 484.) Indeed, when considered in the context of the record as a whole for the relevant time period, Dr. Koltuska-Haskin's opinions regarding Mr. McGehee's conditions and symptoms are entirely consistent with a GAF score of 35-40 and the other evidence of record. Mr. McGehee's initial evaluation with Dr. Koltuska-Haskin had to be postponed due to Mr. McGehee's agitation, use of profanity, and inability to focus. (AR 434, 481.) Even after Mr. McGehee started taking medication, Dr. Koltuska-Haskin noted that Mr. McGehee continued to be "easily agitated and somewhat argumentative" at his appointments, including when his test results were discussed with him, at which time he became "quite argumentative with his mother and needed to be reminded to calm down." (AR 434.) Dr. Hall's notes from the relevant time period document that "mood instability" was one of Mr. McGehee's chief complaints when he established care with Dr. Hall in April 2014. (AR 483.) They further indicate that while the Adderall was initially "helpful" with addressing Mr. McGehee's ADHD symptoms, within just two months there was "[s]ome loss of efficacy of Adderall in [the] afternoon[,]" causing Dr. Hall to increase Mr. McGehee's dosage. (AR 465, 466, 477.) Dr. Hall's notes additionally indicate that in August 2014, Mr. McGehee continued to have "irritable moods" as well as sleep problems, which Dr. Hall had been treating with Topomax since June. (AR 465, 477-78.) On the record as a whole, the ALJ's conclusory

comparison of Dr. Koltuska-Haskin's assessed GAF score with Dr. Hall's assessed GAF score is not a legitimate reason for discounting Dr. Koltuska-Haskin's opinions.

The ALJ's final reason for discounting Dr. Koltuska-Haskin's opinion is not only legally inadequate but also unsupported by substantial evidence. The duty to perform a function-by-function assessment belongs to the ALJ, not the medical source, and whether a medical source has provided function-by-function opinions is *not* one of the factors ALJs must consider in weighing that source's opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-8P, 1996 WL 374184, at *3 (explaining that the RFC assessment—which is an issue reserved to the Commissioner, i.e., is the province of the ALJ and not a medical source—"must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis"); *Green v. Comm'r of Soc. Sec. Admin.*, 734 F. App'x 600, 603 (10th Cir. 2018) (unpublished)[9] (noting that "a function-by-function assessment of a claimant's capacities" is something the ALJ, not a medical source, was required to provide). As the SSA's own regulations provide:

> Assessment of functional limitations [resulting from mental impairments] is a complex and highly individualized process that requires *us* to consider multiple issues and *all relevant evidence* to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation. *We* will consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1) (emphases added). Indeed, "medical opinions" is defined in the Social Security Regulations as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms,

---

[9] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

18

diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). Opinions regarding a claimant's functional limitations are, by definition, but one kind of statement that reflects an acceptable medical source's judgments about a claimant's impairments. The absence of opinions regarding a claimant's specific functional limitations is not a basis for discounting an acceptable medical source's other opinions—i.e., opinions regarding symptoms, diagnoses, and prognoses—that reflect on a claimant's impairments.

Here, Dr. Koltuska-Haskin's report contains many statements that constitute "medical opinions" under the regulations. She diagnosed numerous mental impairments (AR 440), described Mr. McGehee's symptoms (AR 432-40), *and* rendered opinions as to as to certain functional limitations she believed Mr. McGehee to have. Specifically, she opined that Mr. McGehee's "attention/concentration abilities were significantly compromised" and noted "significant lapses of attention . . . throughout the evaluation." (AR 436.) She also opined, based on his score from the WAIS-IV test, which was "in the low average range," that Mr. McGehee "has below average ability to perform mental operations on immediate memory." (AR 437.) Moreover, she opined that he "has defective ability to exercise mental and behavioral flexibility within problem solving situations" as well as "significant difficulty in executive functioning." (AR 437.) The abilities to "[u]nderstand, remember, or apply information; . . . concentrate, persist, or maintain pace; and adapt or manage oneself" are three of the four basic mental demands required of unskilled work. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see* Program Operations Manual System ("POMS") § DI 25020.010A.3.a. That Dr. Koltuska-Haskin did not translate her comprehensive neuropsychological evaluation, comprising results from a battery of eighteen psychological tests that she administered over the course of four months, into a check-the-box, function-by-function

assessment does not limit the usefulness of the opinions she rendered therein. The only thing that limited the usefulness of Dr. Koltuska-Haskin's opinions to the ALJ in determining Mr. McGehee's functional limitations was the ALJ's own failure to comply with his duties to consider "all relevant evidence" and apply the applicable regulatory factors in weighing Dr. Koltuska-Haskin's opinions.

In sum, the ALJ's reasons for discounting Dr. Koltuska-Haskin's opinions are both inadequate as a matter of law and not supported by substantial evidence. The ALJ's failure to demonstrate that he complied with the correct legal standards for weighing Dr. Koltuska-Haskin's opinions requires reversal and remand.

**B.      The ALJ erred by failing to account for certain of Dr. Walker's uncontroverted opinions or explain why he was rejecting them.**

At the same time that he accorded "little weight" to the opinions of the only treating source of record and only "some weight" to the opinions of the only other examining source, the ALJ accorded "[s]ignificant weight" to the opinions of Dr. Walker, a non-examining source whose opinions were based on a review of Mr. McGehee's medical records. Despite according Dr. Walker's opinions significant weight, though, the ALJ failed to incorporate—or explain why he rejected—certain of the moderate mental limitations Dr. Walker assessed Mr. McGehee as having. This additionally constitutes reversible error. *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (explaining that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability" and remanding where it was "unexplained" why the ALJ adopted some of the doctor's opinions regarding the claimant's restrictions but not others).

In the Mental Residual Functional Capacity Assessment ("MRFCA") he completed in January 2015, Dr. Walker found that Mr. McGehee has moderate limitations in three of the four

broad functional areas that the SSA has determined comprise the basic mental demands of unskilled work: (1) understanding, carrying out, and remembering simple instructions; (2) responding appropriately to supervision, coworkers, and usual work situations; and (3) dealing with changes in a routine work setting. (AR 091-93.) *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); POMS § DI 25020.010A.3.a. He found Mr. McGehee to have no limitations in making judgments that are commensurate with the functions of unskilled work, the fourth broad functional area. (AR 092, 093.) *See id.* In the area of understanding, carrying out, and remembering simple instructions, Dr. Walker assessed moderate limitations in five of the eight specific mental abilities associated with that area of functioning: the ability to (1) maintain attention and concentration; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; and (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 092.) *See* POMS § DI 25020.010B.2.a. In the area of responding appropriately to supervision, coworkers, and usual work situations, Dr. Walker assessed moderate limitations in two of the three specific mental abilities associated with that area of functioning: the ability to (1) accept instructions and respond appropriate to criticism from supervisors; and (2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 092-93.) *See* POMS § DI 25020.010B.2.c. And in the area of dealing with changes in a routine work setting, Dr. Walker assessed a moderate limitation in the one specific mental ability associated with that area of functioning: the ability to respond appropriately to changes in a routine work setting. (AR

093.) *See* POMS § DI 25020.010B.2.d. Dr. Walker then concluded in his narrative explanation of Mr. McGehee's RFC that:

> [w]hen treatment/medication compliant and substance free, [Mr. McGehee] retains the capacity to understand, remember, and carry out simple instructions, attend and concentrate sufficient to complete a routine work day without significant interruptions from psychologically-based symptoms; exercise reasonable judgment; interact appropriately with coworkers[,] supervisors[,] and the general public on a superficial basis.

(AR 093.)

The ALJ's discussion of Dr. Walker's opinions refers only to Dr. Walker's narrative explanation and includes no mention of Dr. Walker's individual MRFCA findings regarding Mr. McGehee's mental limitations. (AR 033-34.) Mr. McGehee argues that the ALJ's exclusive reliance on Dr. Walker's narrative explanation constitutes error in this case because Dr. Walker's narrative explanation failed to account for all of the limitations he found in his MRFCA. (Doc. 18 at 15-16.) The Court agrees.

Most obviously, Dr. Walker's narrative explanation does not account for his finding that Mr. McGehee has a moderate limitation in his ability to respond appropriately to changes in the work setting. The ability to "deal with changes in a routine worksetting" is one of the four areas of basic mental demands required of unskilled work. POMS § DI 25020.010A.3.a. It is separate and distinct from the ability to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; and respond appropriately to supervision, coworkers, and work situations. *See id.*; *see also Gonzales v. Colvin*, 213 F. Supp. 3d 1326, 1332 (D. Colo. 2016) (explaining that "an inability to adapt to changes in the workplace is inconsistent with the most fundamental demands of unskilled jobs" (citing SSR 85-15, 1985 WL 56857, at * 4)). Dr. Walker's conclusion that Mr. McGehee retains the ability to meet the other three basic mental demands required of unskilled work plainly fails to encapsulate his finding

regarding Mr. McGehee's moderate limitation in the fourth basic mental demand required of unskilled work. *See* POMS § DI 25020.010A.3.b ("A substantial loss of ability to meet *any* of the basic mental demands" in any of the four areas of mental activity "severely limits the potential occupation base and thus, would justify a finding of inability to perform other work even for persons with favorable age, education and work experience." (emphasis added)); *cf.* SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) ("A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability."). As such, Dr. Walker's narrative explanation cannot, alone, supply substantial evidence to support the ALJ's RFC, which included no limitation on Mr. McGehee's ability to respond appropriately to changes in the work setting. *See Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished) (explaining that "if a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding").

Indeed, the ALJ appeared to recognize the distinction between the four basic mental demands required of unskilled work in his step-three analysis yet failed to carry over that critical distinction—and a finding of a moderate limitation in Mr. McGehee's ability to adapt—in assessing Mr. McGehee's RFC. In this step-three analysis, the ALJ acknowledged that "[a]s for adapting . . . oneself, [Mr. McGehee] has experienced a moderate limitation. He reported . . . that he did not like change and did not handle stress well. . . . [Mr. McGehee's] mother reported that . . . he did not handle stress or changes in routine well[.]" (AR 025.) Inexplicably, the ALJ failed to account for Mr. McGehee's recognized adaptation limitation in the hypothetical RFC he

23

presented to VE King. Instead, the RFC he presented to VE King provided that "[c]hanges in the work setting would be limited to simple work-related decisions." (AR 074.) But a restriction to "simple work-related decisions"—which is associated with the ability to exercise judgment—does not account for a limitation in the ability to appropriately respond to changes in the workplace, which is associated with a different of the four basic mental demands. *Compare* POMS § DI 25020.010B.2.b, *with* POMS § 25020.010B.2.d; *cf. Groberg v. Astrue*, 505 F. App'x 763, 770 (10th Cir. 2012) (unpublished) ("A limitation to 'simple work' or 'unskilled jobs' is generally insufficient to address a claimant's mental impairments."). The ALJ erred by failing to either account for the moderate limitation in adaptability or explain why he rejected Dr. Walker's uncontroverted opinion that Mr. McGehee had a moderate limitation in responding appropriately to changes in the workplace.[10]

## C. The ALJ erred by failing to develop the record as to Mr. McGehee's anoxic brain injury.

The Court briefly addresses Mr. McGehee's final alleged point of error: that the ALJ breached his duty to develop the record with regard to Mr. McGehee's anoxic brain injury. (Doc. 18 at 23-26.) Because of the nonadversarial nature of disability hearings, the ALJ has a "duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Wall v. Astrue*, 561 F.3d 1048, 1062-63 (10th Cir. 2009) (internal quotation marks omitted). The "duty is one of inquiry and factual development[,]" *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993), and exists "even if the claimant is represented

---

[10] While the Court has focused its analysis on the ALJ's failure to incorporate or explain why he was rejecting Dr. Walker's opinion that Mr. McGehee has a moderate limitation in his ability to respond appropriately to changes in the workplace, other of Dr. Walker's moderate limitations are also not clearly accounted for in the ALJ's RFC or rejected with supporting explanation. On remand, the ALJ must take care to either account for all of the moderate limitations assessed by Dr. Walker or explain, with well-supported reasons, why he is rejecting certain, but not other, limitations, particularly if he continues to accord greater weight to Dr. Walker's opinions than those of treating and/or examining sources.

by counsel." *Wall*, 561 F.3d at 1063 (internal quotation marks omitted). For an issue to be considered "raised," the record must contain "some objective evidence . . . suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). "Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment." *Id.* However, if the claimant has sustained his burden of ensuring that there is evidence in the record "sufficient to suggest a reasonable possibility that a severe impairment exists[,]" the ALJ is responsible for further developing the record to help resolve the issue of impairment. *Id.*

As already discussed, the record contains more than "some objective evidence" suggesting that Mr. McGehee suffered an anoxic brain injury, an impairment that could have a material impact on the disability determination in this case. Dr. Koltuska-Haskin's report sufficiently raised the issue of the possible effect that Mr. McGehee's "[h]istory of anoxic brain trauma" may have on his ability to work such that the ALJ's failure to develop the record further constitutes reversible error. That failure is particularly troubling given that, as discussed above, the ALJ discounted Dr. Koltuska-Haskin's opinions because he believed that there was "no evidence" of that condition in the record. The ALJ himself could have—indeed *should* have, on this record—remedied that perceived deficiency by further developing the record rather than relying on it to discount Dr. Koltuska-Haskin's opinions. *See* 20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2) (explaining under what circumstances the SSA will take additional action when it considers the evidence "insufficient" to make a disability determination).

## V. Conclusion

For the reasons stated above, Mr. McGehee's Motion to Reverse or Remand (Doc. 18) is

**GRANTED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**